ROCHESTER GERMAN INS. CO. OF ROCHESTER, N. Y., v. SCHMIDT et al.

(Circuit Court, D. South Carolina. February 26, 1907.)

1. INSURANCE—AVOIDANCE OF POLICY FOR BREACH OF CONDITION—TITLE OF IN-SURED.

A man built an ice plant with his own money on a part of a block of ground the title to which was in his deceased wife and of which he was the owner by inheritance of a one-third interest. He was an ignorant man who had originally bought the property and honestly supposed it was his own and had always so considered and treated it. On his verbal application to an agent insurance policies were issued to him covering the building and its contents. No written applications were made or required, nor any representations as to the nature or extent of his interest. Under the law of the state a co-tenant who made improvements in the belief that he was the sole owner was entitled to have allotted to him the improved part without taking into consideration the value of his improvements, or in case of sale was entitled to the increased value due to his improvements. *Held,* that the policies were not avoided by reason of a condition therein that they should be void "if the interest of the assured be other than unconditional and sole ownership, or if the subject of the insurance be a building on ground not owned by the assured in fee simple."

[Ed. Note.—For cases in point, see Cent. Dig. vol. 28, Insurance, §§ 603, 605, 607.]

2. SAME—FRAUD—OVERVALUATION OF PROPERTY BY INSURED.

Policies of insurance on the machinery of an ice plant are not void for fraud and overvaluation of the property insured, where there was no intentional deception by the insured, who had no knowledge of the value except from its cost, which was approximately the value given, and the estimate was made by the engineer who installed the machinery, and it was also examined by the agents of the insurers before writing the policies.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 28, Insurance, §§ 597, 598, 984.]

3. SAME—FORFEITURE FOR BREACH OF CONDITION SUBSEQUENT—ESTOPPEL.

Insurance companies are estopped to claim a forfeiture of policies on a manufacturing establishment under a provision therein that they should be void if the plant should cease to be operated for more than 10 consecutive days unless otherwise provided by agreement indorsed thereon or added thereto, where the property insured was an ice plant, supplying only a local demand and not operated during a portion of the year, and it was shown that when it was temporarily shut down some time before the fire notice was given by the insured to the agents of the insurers who took no action thereon.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 28, Insurance, §§ 759, 1037, 1038.]

4. SAME—PROOFS OF LOSS—WAIVER.

Where proofs of loss under insurance policies were furnished by the attorneys for the insured, with a request to be notified of any insufficiency

or if anything further was required, but no such notice was given or objection made, and in subsequent actions on the policies the insurers denied all liability thereon, any defects in the proofs are immaterial and cannot be taken advantage of to defeat a recovery.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 28, Insurance, §§ 1391, 1393.]

5. SAME—ACTION ON POLICIES—DEFENSES.

Evidence *held* insufficient to sustain a claim of insurance companies that insured property was intentionally burned or that the insured testified falsely in swearing that he had no knowledge of the origin of the fire.

In Equity. On final hearing.

John T. Seibels and John P. Thomas, Jr., for complainant.
W. Boyd Evans, L. D. Melton, and D. W. Robinson, for defendants.

BRAWLEY, District Judge. The opinion overruling the demurrer, 126 Fed. 998, states the case which now comes up on the report of the testimony taken by the special master.

Frederick Schmidt, an aged and unlettered German, was in 1902 the owner of the eastern half of the square bounded by Main, Green, Sumter, and Divine streets in the city of Columbia, on which were several stores and other buildings, including his residence and a laundry. The lot adjoining the laundry and his residence, containing about a half acre, belonged to his wife who had died intestate several years before leaving him and his five daughters her heirs at law. The ice plant was erected on this lot, and four policies of insurance against fire, all of like tenor, were issued by the companies named to Frederick Schmidt May 14, 1902, covering pro rata the items stated in each policy, to wit:

| | |
|---|---|
| On a brick building | $1,350 00 |
| On machinery and implements | 5,850 00 |
| On boilers and engines | 750 00 |
| On stock of ammonia | 75 00 |
| On stock of salt | 75 00 |

The fire occurred December 30, 1902. The policies of insurance were assigned March 12, 1903, to Nora Martin Schmidt, a young woman whom Schmidt had married in the previous September. Suits having been commenced on these policies, the plaintiff filed this bill alleging that the policies were void on several grounds: (1) That Schmidt represented himself as sole owner of the property, when in fact he was owner only of an undivided one-third interest therein; (2) that he represented the property insured to be worth $8,100, whereas in fact it was not worth more than one-half that amount; (3) that the property insured was a manufacturing establishment which had ceased to be operated for 10 consecutive days; (4) that Schmidt filed his proofs of loss which were informal, inaccurate, and false; (5) false swearing, in stating that the origin of the fire was unknown to him and did not originate by any act, design, or procurement on his part, and concealment and misrepresentation of material facts in regard thereto. These will be considered in the order stated.

1. The policies in question contain the following clauses:

"This entire policy shall be void if the insured has concealed or misrepresented, in writing or otherwise, any material fact or circumstance concerning this insurance or the subject thereof, or if the interest of the insured be not truly stated herein. This entire policy shall be void if the interest of the assured be other than unconditional and sole ownership, or if the subject of insurance be a building on ground not owned by the assured in fee simple."

It is not disputed that the title to the lot was in the name of his late wife, and under the law of South Carolina he was entitled to one-third interest therein, the remaining two-thirds belonging to his children. He testified that he had originally bought and paid for it, and always paid the taxes on it, and built houses thereon, and collected the rents and controlled them; and it is not disputed that he built and paid for the erection of the ice plant building and machinery, and that none of his children during his lifetime claimed any interest or ownership therein. The proposition of law relied on by the insurance companies is this:

"A contract of insurance is one of indemnity, requiring insurable interest on the part of the insured, and therefore the extent and nature of such interest are very material to the contract and the risk; since an absolute, unconditional owner has a far stronger motive to care for and protect the property than one who is not the absolute, unconditional owner."

As a general proposition this is sound law, and the reason for it is stated by Chief Justice Marshall in Columbian Insurance Company v. Lawrence, 2 Pet. 48 (7 L. Ed. 335):

"Insurances against fire are made in the confidence that the assured will use all the precautions to avoid the calamity insured against which would be suggested by his interest. The extent of this interest must always influence the underwriter in taking or rejecting the risk and in estimating the premium. So far as it may influence him in this respect it ought to be communicated to him."

There is not the slightest ground for suspicion that Schmidt had any interest or intention to misrepresent the nature of his interest in this property. He had always used the land as his own, had put up other buildings on it and collected the rents, had paid the taxes, and the building and machinery insured was erected and paid for exclusively by him; and any loss by fire or otherwise would have fallen entirely upon him. There was no written application for the insurance, and no representation as to the nature or extent of his interest in the property insured. He simply asked the agents to insure the ice plant for him, and that they get up a form covering the machinery and buildings. He evidently considered them to be his property, and no question was asked as to the title to the land on which the buildings stood.

By the law of South Carolina a co-tenant who makes improvements under the belief that he is sole owner is entitled to have allotted to him the improved part, not taking into consideration the value of the improvements, or in case of sale by allotting to him the increased purchase price. McGee v. Hall, 28 S. C. 564, 6 S. E. 566; Johnson v. Pelot, 24 S. C. 255, 58 Am. Rep. 253; Hall v. Boatwright, 58 S. C. 548, 36 S. E. 1001, 79 Am. St. Rep. 864. Undoubtedly Schmidt had an insurable interest. He was entitled to the ownership in fee of one-

third of the lot, and had an equitable interest certainly in the buildings and machinery placed thereon and paid for with his own money. The loss of the buildings and machinery would have been entirely his. Mr. Justice Story, in the case of the Columbian Insurance Company v. Lawrence, supra, says:

"One of the tests, and certainly a decisive test, whether a misrepresentation or concealment is material to the risk is to ascertain whether if the true state of the property or title had been known it would have enhanced the premium."

There is not the slightest ground for believing that such would have been the case. The ground for avoiding a policy where the ownership is only partial is that the insured will be more watchful of its preservation if he is the absolute owner of the whole than if he has only a partial interest. In this case there is not the slightest ground to doubt that Schmidt would feel the same solicitude in protecting and preserving the property insured as he would have felt if he had had the legal fee in the land; for any loss would have fallen entirely upon him, and would not have been shared by those who shared with him in the legal title. The extent of the ownership of the buildings and machinery insured is the important element of inquiry, and there is no doubt that Schmidt was the owner of this property who would have suffered by its destruction. There is not a particle of proof of any intentional misrepresentation or concealment; no ground to believe that the insurance company would have refused to insure had they known the true state of the title, or that the premium or risk was enhanced.

Chief Justice McIver, in Pelzer Company v. Sun Fire Insurance Company, 36 S. C. 269, 15 S. E. 583, says:

"Insurance companies or their agents are, of course, assumed to know what facts and circumstances are material to the risk offered, much better than the persons who are applying for the insurance, and if they choose to accept the risk without inquiry, and when a loss occurs it appears that some fact which the insurance companies may regard as material to the risk was not communicated by the insured, common honesty and fair dealing forbid that this shall operate as a forfeiture of the policy unless it also appears that the insured either knew at the time, or ought to have known, that such fact was material. Inasmuch as insurance companies when applied to for insurance have the right to make, and as a matter of fact do make, the fullest and most minute inquiries when the application is in writing, the insured has a right to assume when no such inquiry is made, either that the insurance companies or their agents are fully acquainted with all the facts material to the risk, or that they do not regard such facts as are not stated as material. As was said in Clark v. Manufacturing Company, 8 How. 249 (12 L. Ed. 1061): 'If the insurer asks for information and the insured makes no representation it must be assumed that the insurer has in person or by agents in such a case obtained all the information desired as to the insured premises, or ventures to take the risk without it. He must in point of law be deemed to do it at his peril.'"

Citing with approval remarks of Lord Mansfield to the same effect in the leading case of Carter v. Boehm, 3 Burr. 1905.

Where the assured has paid ample consideration for the protection sought, has been guilty of no intentional misrepresentation or concealment, and the circumstances show, as they clearly do here, that the assured honestly believed that the property insured was his own, it would be unconscionable to hold that the policies are for-

feited because an ignorant man has been honestly inadvertent or mistaken as to the nature of his legal title in the land upon which the insured property stood, it being clear that he had an insurable interest in it and was equitably entitled to the whole; and the mistake as to his legal title to the land did not enhance the risk to be incurred or the premium to be paid.

2. The second ground is based upon the claim of misrepresentation and fraud by the assured, in overvaluing the property in representing it to be worth $8,100, whereas in fact it was not worth more than one-half that amount. Fred. Schmidt was an old man at the time when he undertook the building of this ice plant. He had had no experience in this business, and, as is not infrequently the case, the venture turned out to be an unprofitable one. The proofs clearly show that the building which was insured for $1,350 cost more than that sum. Shand, a witness offered by the insurance companies, an architect and builder, places the value of the building at $1,539.50. Witnesses for the assured place a considerably higher value upon it. The testimony clearly shows that $1,350 on the building was not an overvaluation. The machinery and implements were insured for $5,850. A great deal of testimony was offered on this point. The machinery was bought from one Behre, the agent of a large manufacturing establishment in Pennsylvania, and was secondhand. It had been used for a temporary purpose in Augusta, Ga., and one of the witnesses connected with the company there which operated it for a little while places a very low valuation upon it. Other witnesses were offered tending to discredit him and to show that his opinion was worth little. The price paid in Augusta was $3,000, to which $1,450 for additional parts, and $400 for other supplies to complete the plant must be added; and besides this, Schmidt paid all the expenses of taking down the plant, removing it to Columbia, and erecting it again. The total cost of the plant, exclusive of the boilers and engines, was considerably over $5,000, and it appears that after it was erected Schmidt expressed great dissatisfaction and Behre offered to take it back at the actual price paid, less $250, and stated that he could have sold the plant to others for a higher price than that paid by Schmidt. It would serve no good purpose to review all the testimony; much of it is of little value, from the character of the witnesses and prejudice and from their lack of knowledge. The plant was erected by Campbell, an engineer employed for the purpose. The insurance agents had the opportunity of examining it before writing the policies and did examine it, and the estimates of value seem to have been made out by Campbell; and as there is no evidence of intentional deception on the part of Schmidt, who had no knowledge of or experience with this kind of machinery, and who relied mainly upon what he knew of the actual moneys paid out by him and the estimates of Campbell, the charge of fraud and overvaluation is not sustained.

3. The third ground for avoiding the policies is that the property insured was a manufacturing establishment which had ceased to be operated for 10 consecutive days. The clause is each of the policies under which this forfeiture is claimed is as follows:

"This entire policy, unless otherwise provided by agreement indorsed hereon or added hereto, shall be void if the subject of insurance be a manufacturing establishment and it be operated in whole or in part at night later than 10 o'clock, and cease to be operated for more than 10 consecutive days."

The policies were taken out on May 14, 1902. The ice plant was not in operation at that time and did not begin operations until some time in June, much more than 10 days after the policies were taken out, so that if its literal construction is given to this clause the policy was void from the beginning. It is not controverted that the ice plant was shut down for considerably more than 10 days before the fire. Ordinarily an ice plant of this character, supplying only a local demand, would not be operated at that season of the year, and the witnesses Crafts and Stebins show that the plant was being overhauled and put in condition to begin operations shortly before the fire. The testimony shows that both Walker and Ravenel, members of the firm of Julius H. Walker & Co., the agents of the insurance companies, had visited the premises before the writing of the insurance, and that one of them at least was in the neighborhood of the premises after the ice plant had ceased to be operated, going there for the purpose of writing insurance upon some adjoining property; and Schmidt testifies that within a week after the ice factory had shut down he went to Walker's office and informed him that he had closed down the ice factory. It seems that Walker, in addition to his insurance business, is also engaged in the banking business, and that the office where the insurance business is conducted adjoins that of the bank, and Evans narrates a conversation between Schmidt and Walker which took place in his presence after the fire, when the former reiterated the statement that he had notified the latter of the shut-down, and Walker's answer was: .

"Mr. Schmidt, I don't remember whether you did or not. I cannot say; but you should have not come here in my bank, but ought to have gone into the next door there, to the insurance office, where Mr. Ravenel was."

To which Schmidt replied:

"Well, I gave you the insurance, and I think you are the proper one to go to."

I am of opinion that the companies are estopped by the acts, conduct, and knowledge of their agents from insisting on this condition.

4. The fourth ground for avoiding the policies is that the proofs of loss were informal, inaccurate, and false. Inasmuch as the companies deny all liability it is unnecessary to dwell much upon this point. It appears that the proofs of loss were made out by the attorneys of Schmidt, and that they requested the agents of the companies to point out any additional information or forms which they might wish them to comply with. The alleged false swearing in connection therewith will be considered under the next head.

5. False swearing in stating that the origin of the fire was unknown to him and did not originate by any act, design, or procurement on his part, and concealment and misrepresentation of material facts in regard thereto. As already stated, Schmidt, during the autumn of 1902 contracted a second marriage with Nora Martin, a young woman of less

than half his age. This marriage gave great dissatisfaction to his daughters, and all relations between them were broken. A few days after the fire, harassed by these family dissensions, by ill health (culminating in his death before these proceedings were commenced), by debts incurred doubtless in part in connection with the ice plant and its unsuccessful operations, he conveyed all of his real estate to his wife, Nora Martin Schmidt. This precipitated proceedings in involuntary bankruptcy; and on February 21, 1903, Nora Martin Schmidt conveyed this real estate to Mrs. Evans, the wife of one of his attorneys, in two deeds, in which Fred. Schmidt joined, consideration being $9,000, $13,000, and the assumption of all liens, etc. As the result of this arrangement it appears that the debts were paid and the property subsequently reconveyed by Mrs. Evans to Schmidt's daughters. On March 12 he assigned the insurance policies involved in this litigation to Nora Martin Schmidt. Subsequently thereto Schmidt presented himself for and submitted to an examination by and at the instance of the insurance companies, and the alleged false swearing was upon this examination, which was had March 21, 1903. The allegations of false swearing in representing that the insured property belonged to himself, in which no other person or persons had any interest, and misrepresentation as to the value of the property insured have already been considered. The allegation as to which the greater part of the testimony has been offered is that he swore that the origin of the fire was unknown to him and did not originate by any act, design, or procurement on his part; and it is claimed that these statements were false and for that reason vitiated the policies and rendered them null and void. As already stated, these policies had been assigned to Nora Martin Schmidt March 12, 1903. Some time after the examination of Schmidt he endeavored to procure from his wife a reassignment of these policies, and upon her refusal he became very angry with her and swore that she should never recover a dollar on the policies. Much of the testimony under this head consists of confession of Schmidt and statements by the husbands of his daughters tending to show that the ice plant had been burned by Dunn, a brother-in-law of Mrs. Schmidt, and with her connivance. There is no allegation in the complaint that the defendant Nora Martin Schmidt, the assignee of the policies, either by herself or others, burned the plant, and it is doubtful that the testimony is competent under the pleadings, which made the issues proper to be considered. When the bill of complaint was filed Nora Martin Schmidt was the assignee of the policies, and if it had been alleged and proved that the ice plant had been burned by her or by her procurement, that would have been a perfect defense against any claim by her to recover. No such allegation was made, and of course no issue was joined upon it; and all the testimony on this point has been brought in in an irregular and indirect way, under the allegation that Schmidt swore falsely in saying that the origin of the fire was unknown to him. Schmidt's statements made after the assignments of the policies and after he had quarreled with his wife and threatened that she should never recover a dollar upon them are entitled to little weight, and most of the testimony on this point is utterly incompetent. Much of it is given by the husbands of

Schmidt's daughters, who are shown to have been bitterly hostile to Mrs. Schmidt. The charge that Mrs. Schmidt induced her brother-in-law to set fire to her husband's property is highly unreasonable and improbable. She was not at that time the owner of the policies, and no intelligible motive can be assigned for the commission of so infamous a crime. The bitter feeling of hostility against her on the part of some of the witnesses led them to believe her capable of any infamy, and trifling circumstances are magnified into proofs of guilt. These stories, working upon the mind of Schmidt, impaired by disease and troubles and inflamed against his wife by her refusal to reassign the policies to him, cannot be accepted by any court as evidence of the truth of the charges or as evidence that at the time he swore that the origin of the fire was unknown to him he was swearing falsely. There is no sufficient proof that at that time he had any knowledge of the origin of the fire. The testimony, such as it is, tends at most to raise a suspicion, and suspicion is not knowledge, and there is no testimony whatsoever that the fire originated by any act, design, or procurement on the part of Schmidt.

Upon the whole case I find:

(1) That F. Schmidt was the owner of one undivided third interest in the lot of land on which the ice plant was erected; that during the life of his wife and after her death he had always treated the property as his own, controlled it entirely and absolutely, built houses thereon out of his own means, and rented the same and paid taxes thereon, and considered and treated it as his property; that the building and machinery was paid for by Schmidt entirely out of his own means, and treated as his own individual property, and that his children, some of whom lived with him, and all very near, acquiesced in such treatment and control of said property; that there was no fraudulent or intentional concealment or misrepresentation as to the ownership of said property; and that a true and exact statement of the condition of the legal title to the lot of land would not have materially affected or increased the risk or the insurance rate.

(2) I find that the ice plant machinery had cost over $5,000, that the insured had had no experience with such machinery, and that the estimate of the value of the same was made by the engineer in charge of its erection, after going over it with the agents of the respective insurance companies, and that the insured had no experience in making out applications for, or dealing with insurance of this kind, and that the matter was left largely, almost entirely, with the agents of the respective companies, and with the erecting engineer, and that there was no intentional misrepresentation or concealment as to the value of the ice plant building and machinery; and I find that the value of the machinery was $5,000, of the engine and boilers $750, and of the stock of ammonia and salt $150.

(3) I find that the insurance policies were issued May 14, 1902, and that the agents of the respective insurance companies had been on the premises insured and had personally inspected and examined the same; that ice plants when operated at all are necessarily operated continuously day and night, and that the operation of this plant was first begun some time in June, 1902, and was suspended in the autumn,

several months before the fire which occurred in December, and that just prior to the fire the machinery was overhauled with the view of resuming operations; that shortly after its operation was suspended Schmidt personally notified J. H. Walker, the senior member of the insurance firm of J. H. Walker & Company, which had written the several insurance policies, that it had ceased operation; that the ice plant building is located within less than two feet of the steam laundry plant, then owned by Schmidt, and that the same boiler furnished motive power to the ice plant and the steam laundry plant, and that the same was within about 100 feet of the dwelling house occupied by Schmidt; that in October 1902 the same insurance agents who had written the policies on the ice plant wrote a number of policies on the adjoining buildings and were upon the premises and personally inspected the same; that from the circumstances they must have seen and known at that time that the ice plant was not being operated.

(4) I find that the insured offered the proofs of loss shown in the exhibits, and that the attorneys for the insured requested the companies to advise them if the same were not sufficient and instruct them as to what further proofs, if any, were required, and that in the several actions at law brought on the policies each of said companies denied all liability under the same; that at the request of the insurance companies Schmidt presented himself for and submitted to an examination, which examination was had after he had assigned his interest in the policies to Nora Martin Schmidt, and I do not find any competent, satisfactory, or sufficient evidence to warrant the finding that the insured property was burned by Dunn on the procurement of Nora Martin Schmidt, or that she or F. Schmidt knew of the origin of the fire.

(5) I find that the damage to the building was $500; that the machinery was a total loss, except as to the item of salvage amounting to about $300, and that the total damage to the machinery, pumps, etc., for which the insurance companies are liable was $4,700; that the damage to the boilers, connections, etc., was about $50, and the loss on the ammonia and salt was about $100. The total damage by fire covered by the insurance policies sued on herein amounts to $6,000, and the same should be apportioned among and paid by the respective insurance companies.

A decree in accordance with this opinion will be entered.